**CENTRAL DELTA WATER AGENCY and South Delta Water Agency, Plaintiffs,**

v.

**UNITED STATES FISH AND WILDLIFE SERVICE, et al., Defendants.**

**No. 1:09–CV–00861 OWW DLB.**

United States District Court, E.D. California.

Sept. 8, 2009.

fice, Linus Serafeim Masouredis, Metropolitan Water District of Southern California, Eileen M. Diepenbrock, Diepenbrock Harrison, Kevin M. O'Brien, Maya Ries Ferry, Downey Brand LLP, Christian Charles Scheuring, Kari E. Fisher, California Farm Bureau Federation, Sacramento, CA, Paul S. Weiland, Nossaman LLP, Irvine, CA, Andrew B. Sabey, Scott B. Birkey, Cox, Castle & Nicholson LLP, Elizabeth Avery Lake, Peter W. Landreth, Rafe Petersen, Holland And Knight, LLP, Sarah Ratcliffe Choi, Sonnenschein Nath & Rosenthal, LLP, San Francisco, CA, Danial Zackary Smith, Law Office of Danial Zackary Smith, Visalia, CA, for Defendants.

MEMORANDUM DECISION AND ORDER GRANTING MULTIPLE MOTIONS TO DISMISS (DOCS. 106, 107, 112, 113, 114, 116, 118), GRANTING IN PART AND DENYING IN PART WATER AGENCY DEFENDANTS' MOTION TO STRIKE (DOC. 173), AND DENYING AS MOOT STATE DEFENDANTS' MOTION TO QUASH SERVICE (DOC. 105).

OLIVER W. WANGER, District Judge.

## I. *INTRODUCTION*

This case concerns the ongoing development and preliminary environmental review of the Bay Delta Conservation Plan ("BDCP"), a yet-to-be consummated collaborative approach to restoring the Sacramento–San Joaquin Delta ecosystem, while also protecting water supplies. *See* Defendants' Request for Judicial Notice ("DRJN"), Ex. A, BDCP: An Overview and Update (March 2009) ("Overview and Update"). Plaintiffs, Central Delta Water Agency and South Delta Water Agency, filed this lawsuit against the members of the BDCP "Steering Committee,"[1] alleg-

Diane Kindermann, Glen Hansen, Abbott & Kindermann, Sacramento, CA, for Plaintiffs.

Charles Ray Shockey, United States Department of Justice, Deborah A. Wordham, Michael Lewis Crow, Randy Lee Barrow, California Attorney General's Of-

---

1. The "Steering Committee" is made up of

federal, state, and local water agencies, as

ing that: (1) defendants initiated the scoping process under the National Environmental Policy Act ("NEPA") and the California Environmental Quality Act ("CEQA") without releasing to the public a sufficiently detailed BDCP project description; (2) in retaining a contractor to study the BDCP's possible environmental impacts, defendants violated federal regulations governing contractor conflicts-of-interest; (3) federal and state agencies impermissibly are coordinating their NEPA/CEQA compliance activities; (4) the BDCP lists conservation and water supply as co-equal project goals in violation of the California Natural Communities Conservation Planning Act ("NCCPA"); and (5) the BDCP Steering Committee's meetings did not comply with the California's Bagley–Keene Open Meeting Act. *See* Doc. 1, Complaint. Plaintiffs have since abandoned their conflict-of-interest and NCCPA claims. Doc. 157 at 2 n. 2.

Six groups of defendants move to dismiss all of the claims in the Complaint. Doc. 106 (California Farm Bureau Federation ("CFBF")), Doc. 107 (Environmental Non–Profits), Doc. 112 (Federal Defendants), Doc. 113 (Mirant Delta LLC), Doc. 114 & 118 (Water Agency Defendants), Doc. 116 (State Defendants). The memoranda in support of these motions overlap to a considerable degree. With leave of court, Plaintiffs filed a consolidated, seven-ty-six page opposition. Doc. 157. All of the moving parties replied, again with largely overlapping memoranda. Docs. 175, 177–181.

Defendants jointly filed a request for judicial notice. Doc. 110. Plaintiffs also filed a separate request for judicial notice. Doc. 165. The Water Agency Defendants move to strike certain declarations and exhibits submitted by Plaintiffs in opposition to the motions to dismiss. Doc. 173.[2]

## II. *STATUTORY BACKGROUND*

### A. *NEPA.*

With the passage of NEPA in 1970, Congress "recognize[ed] the profound impact of man's activity on the interrelations of all components of the natural environment" and "declare[d] that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures ... to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331. In order to facilitate informed decision-making and public disclosure, federal agencies prepare an environmental impact statement ("EIS") for "major Federal ac-

well as nonprofit organizations. Overview and Update at 17. Defendants United States Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS"), are *ex officio* members of the Steering Committee. *See* DRJN Ex. B, "Planning Agreement" regarding the [BDCP] (Oct. 6, 2006) ("Planning Agreement") at 14.

2. Plaintiffs object to the hearing of this motion to strike, which contains evidentiary objections directly related to the pending motions to dismiss, on less than thirty days notice. Doc. 182 at 2. This objection is without merit. Local Rule 78–230(e) allows any party to file a counter-motion or other motion that is related to the general subject matter of the original motion. The district court "may" then continue the hearing "so as to give all parties reasonable opportunity to serve and file oppositions and replies to all pending motions." *Id.* Here, the motion to strike was filed August 17, 2008, leaving Plaintiffs adequate time to file an opposition, which they did, on August 18, 2009. There was no need to continue the hearing schedule.

tions significantly affecting the quality of the human environment." *Id.* § 4332(C).

NEPA, along with implementing regulations promulgated by the Council on Environmental Quality ("CEQ"), establishes procedures agencies must follow in determining whether an EIS is required and in developing the EIS itself. One of the first steps in the process of developing an EIS is "scoping," an "early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." *Id.* § 1501.7. As soon as practicable after the decision is made to prepare an EIS and before scoping takes place, the lead agency[3] must publish in the Federal Register a Notice of Intent ("NOI"), which must briefly describe the proposed action and proposed alternatives, provide contact information for an agency representative to answer questions about the project, and describe the agency's proposed scoping process. 40 C.F.R. § 1508.22.

B. *Administrative Procedure Act ("APA").*

■ The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Where no other statute provides a right of action, the "agency action" at issue must also be "final agency action." § 704. "A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." *Id.* "Agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." § 551(13). Agency action is consid-

ered final if it "mark[s] the consummation of the agency's decision making process" and defines parties' rights and obligations or carries other legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

### III. *FACTUAL BACKGROUND*

This is yet another lawsuit arising out of the "increasingly significant and intensifying conflict" between the ecological needs and sustainability of the Sacramento San-Joaquin Delta ("Delta") and the human users of the Delta's resources. *See* DRJN, Exhibit E, Overview of the Draft Conservation Strategy for the BDCP at 3 (Jan. 12, 2009) ("Draft Overview"). The Delta is the largest estuary on the west coast of the Americas, and includes parts of five California counties (Contra Costa, San Joaquin, Sacramento, Solano, and Yolo). Compl. ¶ 84. The estuary supports more than 750 species of plants and wildlife, including several species protected by the federal Endangered Species Act ("ESA"). Compl. ¶ 85. Twenty-three million people, two-thirds of California's population, obtain some of their drinking water from Delta supplies. Compl. ¶ 86. In addition, more than 4 million acres of farmland are irrigated with water from the Delta. *Id.*

The Delta is the hub of both the federal Central Valley Project ("CVP") and the State Water Project ("SWP") (collectively, "the Projects"), which pump water from the Delta near the city of Tracy to supply municipal, industrial, and agricultural users to the south. *See* Compl. ¶ 86. The Projects currently use the Delta's natural and man-made channels to convey water from incoming watersheds to those pumps. This arrangement has deleterious effects on the ecosystem, while related ef-

---

3. Where multiple agencies are involved in a project, the regulations mandate that there be a lead agency in preparing the EIS, but allow agencies to serve as "joint lead agencies" in order to facilitate inter-agency cooperation. 40 C.F.R. § 1501.5.

forts to protect the environment cause uncertainty for those who receive water from the Delta. *See* Draft Overview at 3. "[T]he continuing subsidence of lands within the Delta, increasing seismic risks and levee failures, and sea level rise associated with climate change, serve to exacerbate these conflicts." *Id.* There is little dispute that the current system is in need of fundamental restructuring.

In 2006, various federal and state regulatory agencies, water districts, and other interested parties, began to develop the BDCP, with the stated goal of "provid[ing] for the conservation of threatened and endangered fish species in the Delta and improv[ing] the reliability of the water supply system within a stable regulatory framework." Compl. ¶ 95; Overview and Update at 1. The participants in the BDCP process have all recognized that solving the Delta's problems will require, among other things, capital improvements to the Delta's water conveyance system. BDCP Notice of Intent and Notice of Public Scoping Meetings, 74 Fed.Reg. 7,257, 7,259 (Feb. 13, 2009) ("February 2008 NOI"). Through the BDCP, Defendants intend to obtain long term incidental take permits for any planned changes to the Projects under the NCCPA and ESA. Compl. ¶ 104.

The "principal forum within which key policy and strategy issues pertaining to the BDCP will be discussed and considered" is the "Steering Committee," a group made up of the relevant federal and state regulatory agencies, numerous water contractors, and nonprofit organizations, who all signed a "Planning Agreement," setting forth the goals of the BDCP planning process. *See* Planning Agreement at 22–25.

On January 24, 2008, NMFS and FWS published a "Notice of Intent to Conduct Public Scoping and Prepare an Environmental Impact Report/Environmental Impact Statement," broadly outlining the BDCP. 73 Fed.Reg. 4,178 (Jan. 24, 2008)

("January 2008 NOI"). The January 2008 NOI explained:

> The applicants have identified four potential water conveyance options that are being considered for the habitat conservation planning process: (1) the existing conveyance and system without physical change to conveyance facilities, (2) changes to conveyance in San Joaquin Old and Middle River channels plus separation of San Joaquin corridor from through-delta conveyance, (3) a dual conveyance in which existing conveyance would still be operational plus an isolated facility (not yet constructed) from the Sacramento River to the south Delta, and (4) an isolated conveyance facility (not yet constructed) from the Sacramento River to the south Delta. These four options are undergoing evaluations through the BDCP Steering Committee to assess the relative ability of each to contribute to the goals and objectives of the planning effort. Although the applicant has not yet decided which option(s) will be submitted for consideration under section 10 of the Endangered Species Act, the intent is to narrow the project focus to one or two of the four options or a mixture thereof by fall 2007.

*Id.*

The NOI was updated on April 15, 2008:(1) adding BOR as a third co-lead federal agency; (2) providing further details on the project; and (3) announcing the dates, times, and locations of ten scoping meetings throughout California, held in April and May 2008. 73 Fed.Reg. 20,326 (Apr. 15, 2008) ("April 2008 NOI"). The April 2008 NOI described the BDCP as follows:

> The BDCP will have several core purposes: Habitat restoration and enhancement to increase the quality and quantity of habitat in the Delta; other conservation actions to help address a

number of stressors on covered species; conveyance facilities to enhance operational flexibility and water supply reliability while providing greater opportunities for habitat improvements and fishery conservation; water operations and management actions to achieve conservation and water supply goals; and a comprehensive monitoring, assessment, and adaptive management program guided by independent scientific input. Additional core purposes of the BDCP are to provide for the conservation of covered species within the planning area; to protect and restore certain aquatic, riparian, and associated terrestrial natural communities that support these covered species; and to provide for and restore water quality, water supplies, and ecosystem health within a stable regulatory framework. The EIS/EIR will evaluate the effects of implementing the BDCP, conveyance alternatives, and power line alignments, other nonstructural alternatives, and describe the permits necessary for BDCP implementation.

The BDCP will likely consist of several major elements, including new capital improvements to the water supply conveyance system, a restoration program for important habitats within and adjacent to the Delta in order to improve the ecological productivity and sustainability of the Delta, and monitoring and adaptive management for the restoration program. The plan will also likely include operational improvements for the water supply system in the near-term and for the long-term once any capital improvements have been completed and are operational.

73 Fed.Reg. 20,327. The April 2008 NOI then explained that the BDCP may include, but is not limited to, the following activities:

- Existing Delta conveyance elements and operations of the CVP and SWP;

- New Delta conveyance facilities (including power line alignments) and operations of the CVP and SWP generally described in the BDCP November 2007 Points of Agreement;

- Operational activities, including emergency preparedness of the CVP and SWP in the Delta;

- Operational activities in the Delta related to water transfers involving water contractors environmental programs;

- Maintenance of the CVP, SWP, facilities in the Delta;

- Facility improvements of the Statutory Delta . . . ;

- Ongoing operation of and recurrent and future projects related to other Delta water users, as defined by the Planning Agreement;

- Projects designed to improve Delta salinity conditions; and

- Conservation measures included in the BDCP, including, but not limited to, fishery related habitat restoration projects, adaptive management, and monitoring activities in the Delta.

*Id.* at 20,327–28. The April 2008 NOI also pointed toward the Steering Committee's "Points of Agreement" as the "basis for alternative development":

As part of the BDCP process, the Steering Committee evaluated potential options to address water supply reliability, water quality, and ecosystem health in the Delta. Initial options included various combinations of water conveyance facilities and habitat restoration actions. As a result of this evaluation, the Steering Committee developed the Points of Agreement document that provides an overall framework for moving forward with development of the BDCP. Previous evaluations and potential improvements to the water conveyance system and strategies for in-Delta habitat restoration and enhancement outlined in the

Points of Agreement document will be used for the basis of alternative development, but will not preclude or limit the range of alternatives to be analyzed under NEPA.

*Id.* at 20,378.

Some comments received during the 2008 scoping meetings indicated that more detailed descriptions of the proposed activities and alternatives were needed to permit informed public comment. *See* 74 Fed.Reg. at 7,257. In response, on February 13, 2009, the agencies published another NOI. *See id.* at 7,257–60. The February 2009 NOI contained additional detail about the BDCP's central elements and the alternative conveyance systems under consideration:

The BDCP will likely consist of three major elements: (1) Actions to improve ecological productivity and sustainability in the Delta; (2) potential capital improvements to the water conveyance system, and; (3) potential changes in Delta-wide operational parameters of the CVP and SWP associated with improved water conveyance facilities.

Potential habitat restoration measures that could improve ecological productivity and sustainability in the Delta may involve the restoration of floodplain; freshwater intertidal marsh; brackish intertidal marsh; channel margin, and riparian habitats. Floodplain restoration opportunities exist in the North Delta/Yolo Bypass and upper San Joaquin River areas; intertidal marsh restoration opportunities exist throughout the Delta and in Suisun Marsh. Channel margin habitat restoration opportunities exist for improving habitat corridors and as a component of floodplain restoration. Riparian habitat restoration opportunities exist as a component of floodplain, freshwater intertidal marsh, and channel margin habitat restoration.

Three general alternatives are being considered as they relate to the potential changes in the water conveyance system and CVP/SWP operations. These include: (1) A through-Delta alternative; (2) a dual conveyance alternative; and (3) an isolated facility alternative. In addition, the implications of taking no action, the No Action alternative, will be considered in the analysis. The dual conveyance alternative may include potential new points of diversion at various locations in the North Delta, facilities to move water from new points of diversion to the existing SWP and CVP pumping facilities in the South Delta, and continued use of the existing diversions in the South Delta. The fully isolated facility alternative would include potential new points of diversion at various locations in the North Delta and facilities to move water from new points of diversion to the existing SWP and CVP pumping facilities in the South Delta. The improved through-Delta alternative could include new temporary or permanent barriers to modify existing hydraulics or fish movement within the Delta, armoring of levees along Delta waterways to ensure continued conveyance capacity, and/or actions to improve conveyance capacity in existing Delta waterways.

New points of diversion could be located along the Sacramento River between South Sacramento and Walnut Grove. The new conveyance facility could extend from the new points of diversion to the existing SWP ,and CVP pumping facilities in the South Delta and be located either to the west or east of the Sacramento River. Potential CVP/SWP operations changes include the seasonal, daily, and real time amounts, rates, and timing of water diverted through and/or around the Delta. Potential corresponding changes to water exports could also be developed.

Other actions to reduce threats to listed fish that may be evaluated for implementation by the BDCP include measures to minimize other stressors. These other stressors may include: (1) Non-native invasive species; (2) toxic contaminants; (3) other water quality issues; (4) hatcheries; (5) harvest; (6) non-project diversions; and (7) commercial/recreational activities. Implementation of potential habitat restoration activities and measures to minimize other stressors will be evaluated throughout the Delta, and possibly upstream and downstream of the Delta, as appropriate to meet the objectives of the plan.

Preliminary locations, alignments, and capacities of new conveyance facilities, as well as habitat restoration activities and actions to address other stresses, to be evaluated in the EIS/EIR will be informed by the scoping process. In addition to the alternatives described above, other reasonable alternatives identified through the scoping process will be considered for potential inclusion in the alternatives analysis.

*Id.* at 7,259–60.

The co-lead agencies held a second round of twelve scoping meetings around the State in March 2009. *See id.* at 7,257. Comments submitted during both the 2008 and 2009 rounds of scoping meetings will be considered during the preparation of the EIS/EIR. *Id.*

Plaintiffs complain that the NOIs were "ambiguous," Compl. ¶ 100, and that neither the NOIs nor related documents, including the January 2009 "Overview of the Draft Conservation Strategy for the [BDCP]," provide sufficiently detailed information about the BDCP, Compl. ¶ 101:

108. The language in the NOI is muddled and ambiguous. The "BDCP covered activities may, but are not limited to existing or new activities related to" "new Delta conveyance facilities," "Fa-cility improvements of the CVP and SWP within the Statutory Delta," "future projects related to other Delta water users," "Projects designed to improve Delta salinity conditions," and "Conservation measures included in the BDCP, including, but not limited to, fishery related habitat management, and monitoring activities in the Delta." (NOI, 7259 (Exhibit 1) (bold added).) However, the facilities to be completed such as the new Delta conveyance facilities, their nature and their location have yet to be defined. While a number of alternatives for the new conveyance facilities have been mentioned in other BDCP process documents, the new conveyance facilities remain undefined in the NOI. Also to be determined are the goals and objectives of the BDCP, the species to be covered, and the methods and locations of conservation. Since the project is yet to be defined, it is impossible to accurately describe.

109. Also, to the extent that any decisions about the BDCP have been made, they are not accurately reflected in the NOI. The NOI lists a combination plate of the following proposed actions as constituting the project:

The BDCP is a conservation plan.... [I]ncidental take permits (ITP) for water operations and management activities.... These incidental take authorizations would allow the incidental take of threatened and endangered species resulting from covered activities and conservation measures that will be identified through the planning process, including those associated with water operations of the Federal Central Valley Project (CVP), as operated by Reclamation, the California State Water Project (SWP), as operated by DWR, as well as operations of certain Mirant Delta LLC (Mirant Delta) power plants....

Authorizations that would allow projects that restore and protect water supplies, water quality, and ecosystem health to proceed within a stable regulatory framework. [NOI, p. 7257 (Exhibit 1).]

This description implies that the BDCP is a conservation plan and a take permit for any activities identified in the planning process and an array of other non-specified "authorizations that would allow projects." This description is vague, and omits certain activities that will be included, such as the construction of a conveyance facility, identified in the NOP and is unequivocally, contrary to law. (NOP, p. 7257 (Exhibit 1).) While the location of the conveyance facility is not precisely known, the NOI for the BDCP fails to even include a list of cities and counties where the facilities may be located and which entities' water supply and watersheds may be affected.

Compl. ¶¶ 108–109.

Defendants move to dismiss the NEPA claim for lack of subject matter jurisdiction on standing, ripeness, and sovereign immunity grounds. Alternatively, Defendants argue that the complaint fails to state a claim under NEPA. Finally, Defendants argue that the state law claims should be dismissed because supplemental jurisdiction cannot be exercised unless the district court possesses subject matter jurisdiction over at least one federal claim. Alternatively, Defendants argue that the state law claims should be dismissed on jurisdictional and/or substantive grounds.

### IV. *STANDARD OF DECISION.*

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a motion to dismiss for lack of subject matter jurisdiction. It is a fundamental precept that federal courts are courts of limited jurisdiction. Limits upon federal jurisdiction must not be disregarded or evaded. *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). The plaintiff has the burden to establish that subject matter jurisdiction is proper. *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). This burden, at the pleading stage, must be met by pleading sufficient allegations to show a proper basis for the court to assert subject matter jurisdiction over the action. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); Fed.R.Civ.P. 8(a)(1). When a defendant challenges jurisdiction facially, all material allegations in the complaint are assumed true, and the question for the court is whether the lack of federal jurisdiction appears from the face of the pleading itself. *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir.2004).

### V. *ANALYSIS*

#### A. *Evidentiary Matters.*

##### 1. *Requests for Judicial Notice.*

###### a. *Defendants' Request for Judicial Notice.*

■ Defendants jointly request judicial notice of six documents pertaining to the BDCP, Doc. 110, all of which are officially published online at the BDCP's website,[4] rendering them "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201. All six documents are judicially noticeable for their existence and content, although not for the truth of the matters asserted therein. In addition, three of the documents, the BDCP "Overview and Update" (Mar.2009), Planning Agreement (Oct.2006), and "Points of Agreement" (Nov.2007), are

4. http://resources.ca.gov/bdcp

properly considered because they are relied upon extensively in the Complaint. *Inlandboatmens Union of Pac. v. Dutra Grp.*, 279 F.3d 1075, 1083 (9th Cir.2002) (although generally a district court may not consider material beyond the pleadings on a Rule 12(b)(6) motion, a document to which the complaint specifically refers may be considered if its authenticity is not questioned).

Defendants' request for judicial notice is GRANTED in its entirety.

### b. *Plaintiffs' Request for Judicial Notice.*

■ Plaintiffs request that judicial notice be taken of thirty six (36) documents. Doc. 165. Many of these, namely Documents 1, 3–7, 9–15, 22–23, 25, 27–28, and 30–34, are statutes and/or regulations, which may be considered as a matter of course, without the necessity of judicial notice. Three others, Documents 17, 26, and 29, are treatises on NEPA and/or CEQA, which, as generally recognized scholarly source material, may also be considered, but only as persuasive authority.

■ Plaintiffs' Document 24 is a publication in the Federal Register, which is judicially noticeable pursuant to 44 U.S.C. § 1507 ("contents of the Federal Register shall be judicially noticed"). Documents 2 (BDCP Governance Working Group, Preliminary Recommendations for Governance Structure), 8 (BDCP EIR/EIS Process Presentation), and 16 (Memorandum Agreement for Supplemental Funding), are judicially noticeable public documents available on the BDCP website, although they are not admissible for the truth of the matters asserted therein. Documents 18 through 21 are Memoranda and Handbooks concerning the implementation of NEPA, all of which are public records judicially noticeable for their content and existence. The same applies to the opinions of the California Attorney General, Documents 35 and 36, which are judicially

noticeable persuasive, but non-binding authority. *See Louis v. McCormick & Schmick Restaurant Corp.*, 460 F.Supp.2d 1153, 1156 n. 4 (C.D.Cal.2006).

Plaintiffs' request for judicial notice is GRANTED as to Documents 2, 8, 16, 18–21, and 24, and DENIED, as unnecessary, as to all other documents, which, as statutory legal authorities, may be considered without taking judicial notice.

### 2. *Motion to Strike.*

In support of their opposition to Defendants' motions, Plaintiffs filed the Declarations of John Herrick, Manager and General Counsel for South Delta Water Agency, Doc. 159, and Dante John Nomellini, Sr., Manager and Co–Counsel for Central Delta Water Agency, Doc. 158. The Water Agency Defendants move to strike both declarations in their entirety.

Water Agency Defendants argue that where motions to dismiss present either a facial attack under Federal Rule of Civil Procedure 12(b)(1) and/or arguments under Rule 12(b)(6), a court is limited to consideration of the allegations contained in the complaint, with two exceptions:

> First, a court may consider "material which is properly submitted as part of the complaint. . . ." Second, under Fed. R.Evid. 201, a court may take judicial notice of "matters of public record."

*Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir.2001) (internal citations omitted).

■ Plaintiffs respond that extrinsic evidence is admissible here because the Water Agency Defendants' motion to dismiss actually is a *factual attack* on the complaint. Specifically, Plaintiffs point to Page 4, lines 27–28 of the Wager Agency Defendants' Motion, which states: "Defendant Water agencies bring a facial attack on subject matter jurisdiction, *and join in*

*the subject matter jurisdiction attacks brought by the other defendants.*" Doc. 118–2 at 4 (emphasis provided by Plaintiffs). Plaintiffs suggest, without identifying any specific arguments in the other parties' papers, that other Defendants' motions to dismiss raise factual attacks. They do not. For example, although several other parties challenge Plaintiffs' standing to sue, they do so based on the face of the complaint. *See* Doc. 112 (Federal Defendants assert that despite allegations of procedural injury in the form of the publication of the NOIs and the decision to conduct scoping prior to issuance of a draft BDCP, Plaintiffs cannot possibly identify any harm to their concrete interests that are reasonably probable to result from these actions, because publication of an NOI and conducting scoping will not result in the undertaking of a project). The Herrick and Nomellini declarations simply reiterate, albeit in greater detail, assertions in the complaint (e.g., that the issuance of the NOIs and the early scoping process make it impossible for Plaintiffs to meaningfully participate in the NEPA process). The assertions in the complaint must be accepted as true. The Herrick and Nomellini declarations, even if admissible, cannot supplement the complaint.

Similarly, several Defendants argue that Plaintiffs' NEPA claim is not ripe for review, *see, e.g.,* Doc. 112–2 at 17–18, and/or that Plaintiffs' APA claim must be dismissed because no "final agency action" has been alleged, *see, e.g., id.* at 12–17. In response, Plaintiffs argue, relevant to one of the ripeness factors, that delayed review would cause them hardship, Doc. 157 at 22–23, and, relying on a possible exception to the general rule that review is only permissible under NEPA upon issuance of an EIS or related finding, that Plaintiffs will be irreparably harmed if the NEPA violations are not remedied at an early stage. The Herrick and Nomellini declarations do not add anything material to the facts of the complaint. These declarations merely re-assert that the procedural injury will cause Plaintiffs hardship because they will be precluded from meaningfully participating in the NEPA process, and will irreparably harm Plaintiffs because the process being followed by the agencies may preclude Plaintiffs from properly informing Defendants of their concerns. These theories of harm and irreparable injury are more appropriately presented as legal argument. Extrinsic evidence is unnecessary. Water Agency Defendants' motion to strike the Herrick and Nomellini declarations is GRANTED.

The Water Agency Defendants also object to consideration of Exhibits 3, 9, 10, 11, 12, 13, and 21, attached to the Declaration of Glenn C. Hansen in Support of Plaintiffs' opposition. Docs. 160–64 & 173. Water Agency Defendants object that these documents are not appropriately considered in the context of a facial attack under Rule 12(b)(1), nor are they subject to judicial notice. As to Exhibits 3, 10, and 21, these correspond to Documents 2, 8, and 16, for which Plaintiffs' request for judicial notice was GRANTED, which moots these objections.

As to Exhibits 9 (a June 24, 2008 letter from Environmental Defense Fund, Natural Heritage Institute, The Bay Institute, and the Nature Conservancy to California Assemblywoman Lois Wolk), 11 (a web page entitled "The Delta: A Water Source for Most Californians" from The Nature Conservancy's Web Site), 12 (a web page entitled "Our Approach to Restoring Land, Water & Wildlife" from the Environmental Defense Fund website), and 13 (a web page entitled "Transforming How California Uses Water: Protecting the Sacramento–San Joaquin Bay–Delta, an ecosystem in Crisis" from the Environmental Defense Fund website), Plaintiffs contend that these documents are admissible as non-

hearsay party admissions, citing Federal Rule of Evidence 801(d)(2)(A) and 901, as well as *United States v. Traylor*, 656 F.2d 1326, 1332 (9th Cir.1981). All of these "admissions" appear to relate to Plaintiffs' theory that the Steering Committee is really a "joint venture" between all of its members. *See* Doc. 157 at 7–8. As the motions to dismiss are resolved on other, justiciability grounds, it is not necessary to address Plaintiffs' joint venture theory or the related admissions. The Water Agency's motion to strike Documents 9 and 11–13 are DENIED AS MOOT.

### B. *Threshold Jurisdictional Issues*

#### 1. *Standing.*

■ To maintain an action in federal court, Plaintiffs must have Article III standing. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 872, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (*"Lujan v. NWF"*). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1)[it] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). In addition to the Article III requirements, which are jurisdictional, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341–42, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006), a plaintiff who brings suit under the APA, 5 U.S.C. § 706, must also establish that it falls within the "zone of interest" of the statute under which the lawsuit is brought, *see City of Sausalito v. O'Neill*, 386 F.3d 1186, 1199 (9th Cir.2004).

■ The burden of establishing the elements of standing falls upon the party asserting federal jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (*"Lujan v. DOW"*). "[E]ach element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" *Bennett*, 520 U.S. at 167, 117 S.Ct. 1154 (quoting *Lujan v. DOW*, 504 U.S. at 561, 112 S.Ct. 2130).

■ These requirements are relaxed somewhat where the injury alleged is procedural. In a "procedural injury" case, the plaintiff must show that: "(1) the [agency] violated certain procedural rules; (2) these rules protect a plaintiff's concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests." *Nuclear Info. and Resource Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 949 (9th Cir.2006).

> A cognizable procedural injury exists when a plaintiff alleges that a proper EIS has not been prepared under NEPA when the plaintiff also alleges a "concrete" interest—such as an aesthetic or recreational interest—that is threatened by the proposed action.

*City of Sausalito*, 386 F.3d at 1197. The "concrete interest" test has been described "as requiring a 'geographic nexus' between the individual asserting the claim and the location suffering an environmental impact." *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir.2005) (quoting *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir.2001)).

It is not disputed that Plaintiffs Central and Southern Delta Water Agencies ("Delta Water Agencies") satisfy the "geographic nexus" and organizational standing requirements. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977),

sets forth the requirements for organizational standing:

> An association has standing to bring a suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 343, 97 S.Ct. 2434.

The owners of lands that lie within the Delta Water Agencies' geographic scope rely on diversions from the Delta for their water supply, and the *potential* BDCP action of "reducing South Delta exports" may negatively impact Delta Water Agencies:

> Reduction in south Delta exports, marginally increases salinity in the south and central Delta due to less dilution of saltier San Joaquin River Inflows and Delta island discharges, particularly in late summer and early fall. These increases in salinity would have minimal negative effects for covered species, but could have negative impacts for agricultural or municipal water users who divert from the south Delta if these salinity levels exceed those needed by these uses.

Draft Overview at 32, 34. The interests Plaintiffs seek to protect in this litigation are germane to the organizations' purposes. The Delta Water Agencies are political subdivisions of the State of California, created by the legislature to ensure a dependable supply of water of suitable quality and acceptable salinity for the Delta to meet the needs of their constituent water users. *See Central Delta Water Agency v. United States*, 306 F.3d 938, 945, 951 (9th Cir.2002). The charters of the two Delta Water Agencies allow them to commence litigation to further their

goals. *Id.* Finally, no argument has been made that any of the claims alleged and/or relief sought by the Complaint requires the participation of individual landowners within Plaintiffs' areas of operation.

 However, although necessary, organizational standing is not sufficient to establish standing in a procedural injury case. Plaintiffs must still establish that "it is reasonably probable that the challenged action will threaten their concrete interests." *Nuclear Info. and Resource Serv.*, 457 F.3d at 949. "[A] free-floating assertion of procedural violation, without a concrete link to the interest protected by the procedural rules, does not constitute an injury in fact." *Ashley Creek*, 420 F.3d at 938. Here, Federal Defendants argue that "plaintiffs cannot show that it is reasonably probable that the challenged action will threaten their concrete interests. This is because, unlike most NEPA suits, the action challenged here is not the preparation (or lack thereof) of an EIS, but only the lead agencies' decision to publish an NOI and conduct scoping without first publishing a detailed draft of the BDCP." Doc. 112–2 at 10. There are no prescribed rules or procedures that govern preparation of the BDCP.

The Complaint alleges that because the NOI is insufficiently detailed, Plaintiffs "cannot determine what impacts the BDCP will have nor whether it complies with the law." Compl. ¶ 117(c). Plaintiffs also allege that the designation of multiple lead agencies "means that applicants, public officials and the general public do not know which NEPA procedures apply to the proposed project and therefore cannot know if the procedures are properly followed." *Id.* at ¶ 117(b). But, Plaintiffs do not set forth a plausible basis for finding that these challenged actions (i.e., the failure to issue a sufficiently detailed NOI, and the designation of multiple lead agen-

cies) are reasonably likely to harm their concrete interests in the Delta. It is possible that the BDCP will be developed in such a manner that any perceived harm to their concrete interests will be eliminated. It is also possible that no BDCP will be finalized at all. There is no legal requirement that a BDCP be completed. In this sense, the challenge is premature.

This case is distinguishable from other situations in which it was "reasonably probable" that a procedural injury under NEPA would threaten a plaintiff's concrete interests. For example, in *City of Sausalito,* the plaintiff challenged a completed EIS. The Ninth Circuit did not require the plaintiff "to demonstrate that a procedurally proper EIS will necessarily protect [a] concrete interest...." *Id.* at 1197. Rather, it was enough to allege that the plan approved by the EIS will result in harm to plaintiff's concrete interests. *Id.* at 1199. Put another way "if the plan is not implemented the 'reasonably probable' threat to [plaintiff's] concrete [ ] interests will have been removed." *Id.; see also Citizens for Better Forestry v. U.S. Dept. of Agriculture,* 341 F.3d 961, 975 (9th Cir. 2003). Here, in contrast, Plaintiffs have not and cannot allege that the BDCP will result in any harm, as no BDCP exists. *See Hawaii County Green Party v. Clinton,* 124 F.Supp.2d 1173 (D.Haw.2000) ("Plaintiff cannot have suffered an injury in fact when Defendants have not yet taken final action.").

Plaintiffs cannot demonstrate standing to bring a procedural injury claim under NEPA because it is not reasonably probable, at this early juncture in the process, that their concrete interests will be harmed. What Plaintiffs in substance seek is to structure the BDCP process to their liking as to make their input "more effective." They have not and cannot allege they have been completely excluded from providing their input in any public

scoping process. Plaintiffs' NEPA claim must be dismissed for lack of subject matter jurisdiction WITH PREJUDICE AND WITHOUT LEAVE TO AMEND.

2. *Ripeness.*

 Alternatively, Defendants argue that Plaintiffs' claims are not ripe for review. Ripeness has both a constitutional and prudential requirement designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). In determining whether a case is ripe, a court considers: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998).

a. *Hardship.*

Plaintiffs assert that delayed review would cause them "hardship" because they would be unable to exercise their procedural rights under NEPA. Doc. 157 at 22. In support of this assertion, Plaintiffs rely on a quote from *Ohio Forestry,* 523 U.S. at 737, 118 S.Ct. 1665, in which the Supreme Court stated that "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place,

for the claim can never get riper." This language must be considered in context. *Ohio Forestry* concerned an environmental group's challenge to the approval of a Forest Management Plan ("FMP") for the Wayne National Forest in Ohio. The Supreme Court held that the challenge to the FMP was *not* ripe for review. With respect to the hardship prong, the Court concluded that to withhold judicial consideration of plaintiffs' claims would not cause hardship "as this court has come to use that term" because the provisions of the plan challenged by plaintiff "do not create adverse effects of a sort that traditionally would have qualified as harm," meaning:

> they do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations. Thus, for example, the Plan does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut.

*Id.* at 733, 118 S.Ct. 1665. The Court reasoned:

> Nor have we found that the Plan now inflicts significant practical harm upon the interests that the Sierra Club advances-an important consideration in light of this Court's modern ripeness cases. *See, e.g., Abbott Laboratories, supra,* at 152–154, 87 S.Ct. 1507. As we have pointed out, before the Forest Service can permit logging, it must focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court. *Supra,* at 1668–1669. The Sierra Club thus will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain. Any such later challenge might

also include a challenge to the lawfulness of the present Plan if (but only if) the present Plan then matters, i.e., if the Plan plays a causal role with respect to the future, then-imminent, harm from logging. Hence we do not find a strong reason why the Sierra Club must bring its challenge now in order to get relief. *Cf. Abbott Laboratories, supra,* at 152, 87 S.Ct. 1507.

*Id.* at 733–34, 118 S.Ct. 1665 (parallel citations omitted).

The Court supported its finding that the challenges to the FMP were not ripe for review by noting that "Congress has not provided for preimplementation judicial review of forest plans." *Id.* at 737, 118 S.Ct. 1665. The Court reasoned that an FMP, "which through standards guides future use of forests," does not "resemble an environmental impact statement prepared pursuant to NEPA." *Id.*

> That is because in this respect NEPA, unlike the NFMA, simply guarantees a particular procedure, not a particular result. Compare 16 U.S.C. § 1604(e) (requiring that forest plans provide for multiple coordinated use of forests, including timber and wilderness) with 42 U.S.C. § 4332 (requiring that agencies prepare environmental impact statements where major agency action would significantly affect the environment). *Hence a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper.*

*Id.* (emphasis added).

Plaintiffs suggest that this passage means that a violation of NEPA procedures, at any time during the NEPA process, is automatically ripe for review. This reading of *Ohio Forestry* is unreasonable and unjustifiably interventionist, as it would effectively grant any party the right

to judicially interfere with the administrative process without regard to ripeness in any NEPA procedural injury case. A more reasonable reading of this language is found in *Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808, 815 (8th Cir.2006) ("*Sierra Club v. USACE*"), interpreting this passage to mean that "[t]he Supreme Court has strongly signaled that an that an agency's decision to issue either a [Finding of No Significant Impact] or an [EIS] is a 'final agency action' permitting immediate judicial review under NEPA." [5]

Plaintiffs next cite a quote from *Sierra Club v. Marsh*, 714 F.Supp. 539, 590 (D.Maine 1989):

> The ultimate harm protected by NEPA is harm to the environment, the risk of bureaucratic commitment may cause real harm to the environment where, as under NEPA, the court may not compel the agency to reach a different result, but may only compel agency reconsideration of its earlier decision in light of the new information acquired through recourse to the NEPA process.

*Marsh* entailed an application for a preliminary injunction to bar the continuation of a construction project. *Id.* at 543. Here, Plaintiffs apparently contend that the showing of "irreparable harm" required to obtain a preliminary injunction is equivalent to the ripeness "hardship" analysis. Even assuming, *arguendo,* this contention is valid, its application to this case is not.

The *Marsh* court found that no irreparable injury would likely result from initiation of the second phase of the construction project, and that even if plaintiffs were likely to succeed on the merits of their NEPA claims, "a likelihood of irreparable physical harm to the environment would have to be demonstrated in order to obtain preliminary injunctive relief." *Id.* at 543. The First Circuit reversed, reasoning that NEPA "seeks to create a particular bureaucratic decisionmaking process, ... whereby administrators make important decisions with an informed awareness of how the decision might significantly affect the environment." *Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir.1989). "[I]f any such decision is made without the information that NEPA seeks to put before the decisionmaker, the harm that NEPA seeks to prevent occurs." *Id.*

> [T]he harm at stake is a harm to the *environment*, but the harm consists of the added risk to the environment that takes place when governmental deci-

---

5. Plaintiffs' reliance on *Sierra Club v. USACE* is similarly misplaced. There, the Army Corps of Engineers issued an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"), in lieu of an EIS, for a project to construct a levee in Jefferson City, Missouri. The government moved to dismiss environmental plaintiff's NEPA challenge, arguing that there was no final agency action by the Corps because it had not yet entered into agreements with the City to construct the levee, nor had it received funding from Congress for the project. *Id.* The district court concluded the environmental plaintiffs lacked standing because no injury was certain to occur until the relevant agencies took additional steps to finalize a levee project. *Id.* at 816. The Eighth Circuit reversed, reasoning that "[i]njury under NEPA occurs when an agency fails to comply with that statute, for example, by failing to issue a required environmental impact statement," and concluded, without providing any reasoning, that "the NEPA dispute was ripe for judicial review when the lawsuit was filed...." *Id.* (citing *Ohio Forestry*, 523 U.S. at 737, 118 S.Ct. 1665).

Plaintiffs partially quote this case to argue that under NEPA "injury occurs when an agency fails to comply with the statute ....," but neglect to acknowledge that the remainder of this sentence adds the qualification: "for example, by failing to issue a required environmental impact statement." *Id.* at 816. This case, like *Ohio Forestry*, stands for no more than that a plaintiff's injury is complete once an agency fails to complete an EIS where one is required.

sionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment. NEPA's object is to minimize that risk, the risk of uninformed choice, a risk that arises in part from the practical fact that bureaucratic decisionmakers (when the law permits) are less likely to tear down a nearly completed project than a barely started project. In Watt we simply held that the district court should take account of the potentially irreparable nature of this decisionmaking risk to the environment when considering a request for preliminary injunction.

*Id.* at 500–01 (emphasis in original).

On remand, the district court reasoned: A NEPA violation which deprives agency decisionmakers of an informed awareness of significant environmental consequences of the challenged action is deemed harmful to the environment, by virtue of the added risk to the environment, ... that arises in part from the practical fact that bureaucratic decisionmakers (when the law permits) are less likely to tear down a nearly completed project than a barely started project. 714 F.Supp. 539 at 546 (internal citations and quotations omitted). Critically, in *Marsh, the environmental review had already taken place,* approving continued construction on the project. The question in *Marsh* was whether continued construction should be enjoined while plaintiffs' claim that the NEPA process had been inadequate was being litigated. In such a case, if a NEPA procedural violation deprives agency decisionmakers of an informed awareness of significant environmental consequences, such a procedural violation may be deemed harmful to the environment, "by virtue of the added risk to the environment, ... that arises in part from the practical fact that bureaucratic

decisionmakers ... are less likely to tear down a nearly completed project than a barely started project." *Id.*

▮ Here, the issue is very different. No project has yet been formulated, nor can the record possibly reveal whether any NEPA procedural violation has deprived agency decisionmakers of an informed awareness of significant environmental consequences. Plaintiffs suggest that they have suffered "hardship" because they have been unable to meaningfully comment on the scope of the EIS/EIR, which resulted in uninformed decision-making in determining the scope of environmental review. While the environmental review process is in progress and incomplete, there is no way to know what the ultimate scope of the environmental review will be.

Plaintiffs also suggest that the "harm cannot be undone after the EIS has been approved because the decision-makers' judgment has been biased by the previously completed process." Doc. 157 at 23. This species of hardship is not recognized in the law. A very similar argument was rejected in *Muhly v. Espy,* 877 F.Supp. 294, 300 (W.D.Va.1995), where plaintiffs argued that "omission from the scoping process ... irreparably harmed them and that additional meetings with agency personnel will be meaningless." Citing the Ninth Circuit's analogous decision in *Northwest Coalition for Alternatives to Pesticides v. Lyng,* 844 F.2d 588 (9th Cir. 1988), *Muhly* reasoned that, absent allegations of bad faith on the part of the agency, plaintiffs were not harmed by omission from the scoping process because plaintiffs would have ample opportunity to be heard in upcoming meetings and public comment processes concerning a draft EIS. *Id.* at 301; *see also Bennett Hills Grazing Assoc. v. United States,* 600 F.2d 1308, 1309 (9th Cir.1979) (request for injunction against agency proceeding with preparation of fi-

nal EIS until plaintiffs had been given ninety days in which to comment on draft EIS not ripe for review because plaintiffs failed to show that judicial review after preparation of the FEIS would be inadequate as a matter of law).

The same conclusion is warranted here. Absent an allegation of bad faith, which is not made, procedural irregularities in the early stages of the NEPA process cannot result in harm because Plaintiffs will have additional legally-guaranteed opportunities to participate. Plaintiffs have not demonstrated hardship.

### b. *Interference with Further Administrative Action.*

■■■ The next ripeness factor concerns whether judicial intervention would inappropriately interfere with further administrative action. *Ohio Forestry*, 523 U.S. at 733, 118 S.Ct. 1665. Defendants maintain that Plaintiffs' judicial intervention into the NEPA process would prove to be enormously disruptive. Doc. 177 at 3 (Federal Defendant's Reply).

> The collaborative BDCP effort among the many federal, state, and local government agencies, water districts, nongovernmental entities, and others is a substantial undertaking, recognizing the critical need for a different approach to conserve the many valuable resources of the Bay–Delta region and the water supply system that serves much of California and which depends on restoring a healthy ecosystem. While the two plaintiff organizations and perhaps others may not support the initial planning effort, their evident dissatisfaction does not warrant the type of extraordinary intervention by the federal judiciary that the plaintiffs seek to impose.

*Id.*

Plaintiffs respond, incomprehensibly, that because it is undisputed that the BDCP has yet to be defined, "judicial review of the NOI at this stage would ensure that, once the project is defined, the environmental review process is properly initiated and the decision-making process properly informed." Doc. 157 at 23. This turns the ripeness doctrine on its head, the purpose of which is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs.*, 387 U.S. at 148–49, 87 S.Ct. 1507.

Plaintiffs rely on *Citizens for Better Forestry*, 341 F.3d at 970–971, 977 (9th Cir.2003) (*"CBF"*), to support the proposition that, where procedural statutes are at issue, courts have held claims to be ripe despite related on-going administrative processes. In *CBF*, the Ninth Circuit held that a NEPA challenge to a rule would not interfere with further administrative action, despite the fact that the agency was working to produce a replacement rule. *Id.* at 977. But, there, the Ninth Circuit specifically found that the administrative process "is at a resting place," because the original rule exists as an optional protocol for the agency to follow while the new rule is being developed. *Id.* Here, the administrative process is undisputedly ongoing and no decision or rule has been made or promulgated.

Plaintiffs raise *Trustees for Alaska v. Hodel,* 806 F.2d 1378, 1381 (9th Cir.1986), as an example of judicial intervention. The facts of *Trustees for Alaska* are entirely distinguishable. *Trustees for Alaska* addressed whether a Legislative Environmental Impact Report ("LEIS") for a statutorily-required report to Congress should be distributed for public comment before submission of that Report to Congress. The Ninth Circuit held that plaintiffs' chal-

lenge to the agency's "clear and final" decision not to provide for presubmission public review and comment of the completed LEIS was ripe, otherwise Congress might act on the Report, effectively causing the plaintiffs to lose their rights to make pre-submission public comments on the LEIS. *Id.* at 1381; *see also Sierra Club v. U.S. Dept. of Energy*, 287 F.3d 1256, 1263 (10th Cir.2002) (challenge to agency decision not to conduct NEPA or ESA analyses before granting an easement to construct road was ripe, despite fact that construction could not proceed without other approvals). Here, by contrast, no portion of the BDCP NEPA review process has yet reached a "clear and final" endpoint.

Plaintiffs' also rely on *National Wilderness Institute v. U.S. Army Corps of Engineers*, 2001 U.S. Dist. LEXIS 25930 (D.D.C.2001). In that case, plaintiffs alleged that the defendant agencies did not conduct a consultation under the ESA with respect to the operation of an aqueduct, from which certain discharges were allegedly harming listed species. *Id.* at *19. Defendants there argued that this challenge was not ripe for review because the Environmental Protection Agency ("EPA") was, at that time, in the process of issuing a new permit for the discharges under the Clean Water Act ("CWA"). *Id.* at *17. The District of Columbia district court held that although the CWA permitting process was ongoing, plaintiffs' ESA challenge to the aqueduct was ripe. *Id.* at *17–18. Here, Plaintiffs' only federal claim is based on alleged failure to comply with pre-EIS NEPA procedures in connection with the development of the BDCP. Allowing this claim to proceed would unwarrantedly interfere with ongoing administrative scoping, planning and formulation activities, which would make it impossible for the agency to "correct its own mistakes and ... apply its expertise." *Ohio Forestry*, 523 U.S. at 735, 118 S.Ct. 1665.

This factor weighs against assertion of jurisdiction.

### c. *Benefit from Further Factual Development.*

■ The final ripeness factor is whether the courts would benefit from further factual development of the issues presented. *Ohio Forestry*, 523 U.S. at 733, 118 S.Ct. 1665. This factor supports dismissal where further factual development may provide additional focus, the agency may revise the plan, or review may ultimately become unnecessary. *See Ohio Forestry*, 523 U.S. at 736, 118 S.Ct. 1665.

■ Plaintiffs maintain that "[t]he NOI is a self-contained notice that must inherently be based on the factual background that exists prior to its issuance. Therefore, there is no further factual background to develop, and the NEPA claims are ripe for judicial review." Doc. 157 at 24. This overly myopic view of the ripeness cannot be the law. Here, the planning process is ongoing and subject to negotiations among many stakeholders with widely competing interests. The factual record will benefit in numerous ways from further development in a dynamic and constantly changing water system where complex hydrodynamics and ecological considerations are continuously in flux. Additionally, scientific studies of the impact of Project operations on threatened species that have precipitated altered flow and water delivery regimes are ongoing. Moreover, the agency may (1) issue additional NOIs, updating the public on developments in the BDCP process; (2) conduct further scoping meetings; (3) issue a draft BDCP and allow public comment on that; (4) fundamentally alter or abandon the currently preferred BDCP alternative; or (5) abandon the project altogether for any number of reasons. Resolution of Plaintiffs claims is reasonably likely to benefit greatly from further factual development

by the administrative agencies. The Plaintiffs offer no genuine value to their proposed interference with the planning process, which has the real potential to obstruct its progress.

### d. *Conclusion Re Ripeness.*

All three ripeness factors weigh heavily against assertion of jurisdiction over Plaintiffs' NEPA claim. Plaintiffs' NEPA claim is, alternatively, DISMISSED WITH PREJUDICE on this ground.

### 3. *Sovereign Immunity*
#### a. *Agency Action.*

■ Alternatively, Defendants argue that Plaintiffs' NEPA claim does not fall within the APA's limited waiver of sovereign immunity, precluding the exercise of subject matter jurisdiction over the only federal claim in this case. NEPA contains no private right of action. *Cetacean Cmty. v. Bush,* 386 F.3d 1169, 1179 (9th Cir. 2004). As a result, NEPA claims must be brought under the APA, and must fall within the APA's limited waiver of sovereign immunity. *Id.; see also Gallo Cattle Co. v. U.S. Dep't of Agric.,* 159 F.3d 1194, 1198 (9th Cir.1998) (APA provides limited waiver of sovereign immunity in suits seeking judicial review of agency action).

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. To trigger section 702's waiver, plaintiffs must "identify some 'agency action' that affects [them] in the specified fashion; it is judicial review 'thereof' to which [they] are entitled." *Lujan v. NWF,* 497 U.S. at 882, 110 S.Ct. 3177.

■ "Agency action" is limited by statute to "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to

act." 5 U.S.C. § 551(13). A "failure to act" is merely "a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13)." *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 62, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) ("*SUWA*"). "All of those categories involve circumscribed, discrete agency actions, as their definitions make clear." *Id.;* see 5 U.S.C. §§ 551(4) (defining "rule"), (6) ("order"), (8) ("license"), 10 ("sanction"), (11) ("relief"). "The only action that can be compelled under the APA is action *legally required.*" *SUWA,* 542 U.S. at 63, 124 S.Ct. 2373 (emphasis in original). Even where a court is asked to compel agency action, it may only direct the agency "to take action upon a matter, without directing how it shall act." *Id.*

■ Here, Plaintiffs seek an order requiring federal defendants to, among other things, release a draft of the BDCP to the public, issue a new NOI, and conduct new scoping meetings. Compl. ¶¶ 140, 149. Plaintiffs cannot dictate the terms or content of any of these documents or meetings. Moreover, none of the complaint's allegations challenge any of the defined categories of "agency action" or failure to undertake one of the forms of agency action, namely the "whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof...." 5 U.S.C. § 551(13). None of these statutory types of administrative action has been taken, nor is there any law requiring the involved agencies to take any such actions.

The cases cited by Plaintiffs are distinguishable. *Coalition for Common Sense in Gov't Procurement v. Secretary of Veterans Affairs,* 464 F.3d 1306, 1317 (Fed. Cir.2006), considered whether a letter issued by the Department of Veteran's Affairs, requiring manufacturers of drugs covered by the Department of Defense's ("DOD") health care plan to refund to

DOD the difference between the drugs' wholesale commercial price and their federal ceiling prices, constituted agency action. The Federal Circuit concluded that the letter fell within 5 U.S.C. § 551(4)'s definition of a substantive "rule." *Id.* at 1317. Likewise, in *Oregon Natural Desert Association v. U.S. Forest Service*, 465 F.3d 977, 983 (9th Cir.2006), the Ninth Circuit classified the Forest Service's issuance of "annual operating instructions" ("AOIs") to permittees who graze livestock on national forest land as "agency action." Because each AOI was specifically incorporated into each grazing license, an AOI is "properly understood to be a license for purposes of determining whether it is an agency action under the APA." *Id.* Here, by contrast, Plaintiffs point to not one "agency action" enumerated in § 551 that could plausibly encompass the administrative proceedings at issue in this case.

Plaintiffs repeat citation to *Trustees for Alaska*, 806 F.2d at 1381, which concerned section 1002(h) of the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3142(h). ANILCA requires the Secretary of the Interior to submit a report to Congress containing: (1) specific information about potential oil and gas production, as well as fish and wildlife resources within the coastal plain of the Arctic National Wildlife Refuge ("ANWR"); and (2) recommendations concerning possible development of oil and gas within ANWR. *Id.* at 1379. Interior determined that it needed to prepare a legislative EIS ("LEIS") in connection with its development of the report, but refused to provide public review and comment prior to submission of the LEIS and the report to Congress. *Id.* at 1380. The Ninth Circuit held that the case was *ripe* for review under *Abbott Laboratories*, 387 U.S. at 148–49, 87 S.Ct. 1507 (1967), insofar as the "disagreement [between the parties] is concrete .... clear and final," because Interior had decided not to provide

pre-submission public review and comment and "denial of review at this point may impose substantial hardship on the [plaintiffs]." *Id.* at 1381. *Trustees for Alaska* did not even consider the APA's "agency action" requirement, which is distinct from the ripeness inquiry.

Because Plaintiffs have not and cannot allege that any APA "agency action," has been carried out, or that the agencies will not take any required action, the APA's waiver of sovereign immunity does not apply and the district court lacks subject matter jurisdiction over Plaintiffs' NEPA Claim, requiring its dismissal.

b. *Final Agency Action.*

■ APA section 704 provides:

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

Where review is sought "not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action in question must be 'final agency action.'" *Lujan v. NWF*, 497 U.S. at 882, 110 S.Ct. 3177 (quoting 5 U.S.C. § 704). "The APA thus insulates from immediate judicial review the agency's preliminary or procedural steps." *Western Radio Servs. Co., Inc. v. Glickman*, 123 F.3d 1189, 1196 (9th Cir.

1997). Section 704 in fact specifically provides that "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."

To be considered "final," the agency action (1) should "mark the consummation of the agency's decision-making process," and (2) "be one by which rights or obligations have been determined or from which legal consequences flow." *Bennett*, 520 U.S. at 177–78, 117 S.Ct. 1154 (internal citations and quotations omitted). Both conditions must be satisfied for agency action to be final. *Id.* at 178, 117 S.Ct. 1154. The Supreme Court has "interpreted the 'finality' element in a pragmatic way." *FTC v. Standard Oil of Cal.*, 449 U.S. 232, 239, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). Certain factors provide indicia of finality, such as whether "the action amounts to a definitive statement of the agency's position," whether the action "has a direct and immediate effect on the day-to-day operations" of the party seeking review, and whether "immediate compliance with the terms is expected." *Oregon Natural Desert Ass'n*, 465 F.3d at 982 (internal citations and quotations omitted). Finality is a jurisdictional requirement. *Lujan v. NWF*, 497 U.S. at 882, 110 S.Ct. 3177; *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 n. 1 (9th Cir.1990).

### (1) Consummation of Decision–Making Process.

To constitute the consummation of an agency's decision-making process, the challenged act "must not be of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178, 117 S.Ct. 1154. The preliminary NEPA steps challenged by Plaintiffs are inherently "tentative" and interlocutory in nature. The agencies engaged the public at an early stage to "ensure that the full range of alternatives and issues related to the development of the BDCP is identified." 74 Fed.Reg. at 7,260. This is consistent with the purpose of the scoping process, which is to "begin[ ] a meaningful dialogue with members of the public about a proposed action." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1117 (9th Cir.2002).

An action marks the consummation of an agency's decision-making process if it constitutes the agency's "last word on the matter." *Oregon Natural Desert Ass'n*, 465 F.3d at 984. In the NEPA context, the action must be the agency's "last word on the project's environmental impact" as a whole. *Friedman Bros. Inv. Co. v. Lewis*, 676 F.2d 1317, 1319 (9th Cir.1982). The issuance of a final EIS or a ROD constitutes final agency action. *Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir.1997) (citing *Oregon Natural Resources Council v. Harrell*, 52 F.3d 1499, 1504 (9th Cir.1995)). In contrast, preliminary decisions, even seemingly final ones, prior to the issuance of a final environmental documents are insufficient. *See Western Radio Servs.*, 123 F.3d at 1197 (final agency decision to construct road not final agency action until EA completed and FONSI issued); *City of San Diego v. Whitman*, 242 F.3d 1097 (9th Cir.2001) (no final agency action where agency issued letter rejecting request for agency's opinion whether certain statutory requirements would apply to a not-yet-filed application to renew a permit); *Earth Island Institute v. Morse*, 2009 WL 2423478, *9 (E.D.Cal.2009) (Regional Forester's letter directing forest supervisors to ensure forest density does not exceed "an upper limit" not final agency action because it

gives supervisor complete discretion to decide what upper limit to use).

 Plaintiffs maintain that the issuance of the NOI is not tentative or interlocutory in nature, and does consummate the agency's decision-making process. Specifically, at oral argument, Plaintiffs asserted that the issuance of the challenged NOIs in this case constituted the consummation of the agency's decision to move forward with the NEPA process before the project had been developed. In support of this assertion, Plaintiffs cite *California v. Block*, 690 F.2d 753, 762 (9th Cir.1982), for the general proposition that agencies are "obliged to adhere to the procedures mandated by NEPA." This unsurprising holding has nothing whatsoever to do with the "final agency action" requirement.

Contrary to Plaintiffs' assertions, the NOI and ongoing scoping activities are, by their very nature, not the agency's "last word" on the BDCP. The last word will be the final adoption of a finite and certain BDCP that is intended to be implemented. Nor is the decision to designate a particular combination of agencies as "lead agencies," as that designation could be changed, actual roles shifted, and/or additional justification provided for any such decision in the final document.

This conclusion is supported by *Muhly*, 877 F.Supp. at 294, where property owners claimed they were improperly excluded from a NEPA scoping process. The agencies had already: (1) decided that the applicant's proposal called for major federal action, thereby necessitating the creation of an environmental impact statement; (2) published an NOI, as well as several revisions to it; (3) and completed the scoping process and identification of preliminary alternative. *Id.* at 300. Nevertheless, no final agency action had taken place because "all of these steps mark the infancy,

not the termination, of the NEPA process." *Id.*

> This is clear when one considers what remains to be done. Among the stages left to be completed are: the issuance of a [draft EIS]; public comment during a compulsory forty-five day waiting period; and the issuance of a [final EIS]. All of these stages require substantial input from the public, during which the Plaintiffs could conceivably cure any of the defects in the NEPA process they believe have taken place so far.

*Muhly*, 877 F.Supp. at 300. It need not be repeated that the BDCP is still undergoing formulation and revision.

#### (2) *Determining Rights, Obligations, or Legal Consequences*

The second prong of the *Bennett* "final agency action" inquiry is whether the action is one by which rights or obligations have been determined or from which legal consequences flow. 520 U.S. at 178, 117 S.Ct. 1154. This test may be satisfied, for example, by an agency action that "alter[s] the legal regime...." *Id. Bennett* held that the issuance of a Biological Opinion and accompanying Incidental Take Statement under the ESA altered the legal regime for the action agency by authorizing take of endangered species in a manner that was not previously permitted. *Id.* In contrast, neither the NOI nor the decision to proceed with multiple lead agencies changes the legal regime governing agency action.

 *Bennett's* second prong may also be met if agency action has a "direct and immediate effect on the day-to-day business' of the subject party," requiring "immediate compliance with [its] terms." *F.T.C. v. Standard Oil*, 449 U.S. at 239, 101 S.Ct. 488 (internal citations and quotations omitted); *Hecia Min. Co. v. EPA*, 12 F.3d 164, 165–66 (9th Cir.1993). In *Hecia*, the Ninth Circuit found that the EPA's

decision, made pursuant to CWA § 304, to include certain rivers on a list of a state's navigable waters not expected to meet water quality standards was not final agency action. *Id.* at 165. The listing decision "does not have the status of law or a direct and immediate effect on the day to day business of the complaining party." *Id.* at 165–66. Rather, the final agency action that would require action on the part of the plaintiff is the issuance of a CWA permit. *Id.* at 166. The listing decision was just a preliminary step in the permitting process. *Id.*

Likewise, the issuance of an NOI, the early initiation of the scoping process, and/or the decision to use multiple lead agencies does not affect Plaintiffs' daily operations or require them to do, or refrain from doing, anything in formulating the BDCP. These are merely preliminary procedures which will lead to the agency arriving at a final decision. In this way, this case is more like *National Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1238 (11th Cir.2003), where the Eleventh Circuit held that the National Park Service had not undertaken final agency action under the APA in evaluating various options for the management of Biscayne National Park, because it had "done nothing beyond establishing a committee to review alternatives[,] ... formulating management options and submitting those plans for public comment." *Id.* As a result, "no rights or obligations have been fixed by its behavior, nor has it taken (or refused to take) action so as to impose any legal consequence on any party." *Id.*

c. *40 C.F.R. § 1500.3.*

■ In arguing that their NEPA claim is reviewable under APA § 704, Plaintiffs

point to 40 C.F.R. § 1500.3, a regulation promulgated by the CEQ, the agency charged with implementing NEPA. These regulations, overall, are entitled to substantial deference. *See Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1244 (9th Cir.1984). Section 1500.3 provides, in pertinent part, that, with respect to regulations implementing NEPA:

> It is the Council's intention that judicial review of agency compliance with these regulations not occur before an agency has filed the final environmental impact statement, or has made a final finding of no significant impact (when such a finding will result in action affecting the environment), or takes action that will result in irreparable injury. Furthermore, it is the Council's intention that any trivial violation of these regulations not give rise to any independent cause of action.

It is undisputed that neither an EIS nor a FONSI has been prepared in connection with the BDCP. Plaintiffs claim that they have suffered "irreparable injury" for the same reasons that they claim "hardship" under the ripeness doctrine (e.g., that issuing a NOI and conducting scoping prior to identifying the nature of the project itself deprived them of a meaningful opportunity to participate in the process). The same result applies. Plaintiffs' exclusive claims of preliminary procedural injury do not rise to the kind of "hardship" or "irreparable injury" necessary to invoke subject matter jurisdiction. *See supra* Part V.B.2.a.[6] Plaintiffs are not entitled by law to direct or dictate how the administrative formulation and ultimate adoption of the BDCP is carried out. If there are any

---

**6.** Whether, in light of the APA's clear imposition of a "final agency action" requirement, the CEQ can carve out an additional exception to the "final agency action" requirement that permits challenges to non-final actions

upon a showing of "irreparable injury," was not raised by the parties. Nor is it necessary to adjudicate that question here, as multiple, alternative grounds for dismissal are present.

infirmities in the process, Plaintiffs may address any illegality at the appropriate time, when all administrative actions to create a final BDCP have occurred.

C. *State Law Claims/Supplemental Jurisdiction.*

■ 28 U.S.C. § 1367(a) provides:

Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, *in any civil action of which the district courts have original jurisdiction,* the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

Dismissal of all Federal claims under Rule 12(b)(1) for lack of subject matter jurisdiction precludes the exercise of supplemental jurisdiction. *See Herman Family Revocable Trust v. Teddy Bear,* 254 F.3d 802, 806 (9th Cir.2001). Here, the only federal claim under NEPA has been dismissed for lack of subject matter jurisdiction on standing, ripeness, and sovereign immunity (based on absence of final agency action) grounds. Supplemental jurisdiction may not be exercised over the Plaintiffs' state law claims. 28 U.S.C. § 1367(c). A federal court has no interest in state claims which are derivative of purported federal claims over which no federal jurisdiction exists.

D. *Motion to Quash Service.*

Dismissal with prejudice of this action renders State Defendants' motion to quash service moot. Doc. 105.

## VI. *CONCLUSION.*

Defendants' motions to dismiss are GRANTED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND. Plaintiffs do not have standing to bring their sole federal claim, arising under NEPA. Alternatively, Plaintiffs' NEPA claim (1) is not ripe for review, and (2) does not fall within the APA's limited grant of sovereign immunity because there has been no final agency action.

Defendants shall submit a form of judgment terminating this action in accordance with this memorandum decision and order within five days of electronic service.

SO ORDERED.